Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/26/2023 09:08 AM CDT

Adams Land & Cattle, LLC, doing business
as Adams Land & Cattle Co., appellee, v.
John Widdowson et al., appellants.

___ N.W.2d ___

Filed May 26, 2023.    No. S-22-534.

1. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court.
2. ____: ____. When statutory interpretation is one of first impression, the statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.
3. **Statutes.** If the language of a statute is clear, the words of such statute are the end of any judicial inquiry regarding its meaning.
4. **Administrative Law: Legislature: Statutes.** The seldom-used rule of legislative acquiescence to administrative interpretations is but a complement to the traditional rules of statutory construction.
5. **Administrative Law: Statutes.** An administrative agency may not employ its rulemaking power to modify, alter, or enlarge provisions of a statute which it is charged with administering.
6. **Administrative Law.** An administrative body has no power or authority other than that specifically conferred by statute or by construction necessary to accomplish the plain purpose of the act.

Appeal from the District Court for Box Butte County: Travis P. O'Gorman, Judge. Reversed, injunction vacated, and dismissed.

Douglas J. Peterson, Attorney General, Joshua E. Dethlefsen, Justin D. Lavene, and Maegan L. Woita for appellants.

Gregory C. Scaglione and Michele Young, of Koley Jessen, P.C., L.L.O., for appellee.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ., and Srb, District Judge.

Funke, J.

## INTRODUCTION

A commercial livestock company and the Nebraska Brand Committee (Brand Committee) dispute the meaning of a statute governing cattle brand inspection. The livestock company brought this action against the Brand Committee's members in their official capacities, seeking a declaratory judgment and permanent injunction reflecting the livestock company's interpretation of Neb. Rev. Stat. § 54-1,122 (Reissue 2021). Following a bench trial, the district court entered a declaratory judgment and permanent injunction in favor of the livestock company. The Brand Committee appeals. For the reasons explained below, we reverse the district court's judgment, vacate its injunction, and dismiss the action.

## BACKGROUND

Nebraska's Livestock Brand Act (the Act) was enacted to detect and prevent livestock theft by establishing a regime for recording livestock brands and inspecting livestock—particularly cattle—to ensure proper ownership.[1] The Act created the Brand Committee, whose voting members are appointed by the Governor and confirmed by the Legislature.[2] The Brand Committee exists to protect Nebraska brand and livestock owners from the theft of livestock through established brand recording, brand inspection, and livestock theft investigation.[3]

---

[1] *NE Beef Producers Committee v. NE Brand Committee*, 287 F. Supp. 3d 740 (D. Neb. 2018).

[2] See Neb. Rev. Stat. § 54-191 (Reissue 2021).

[3] *Id.*

Under the Act, a "brand" is an identification mark applied to the hide of a live animal.[4] All brands must be approved and recorded by the Brand Committee, and a recorded brand is prima facie evidence of livestock ownership.[5] As the following map demonstrates, geographically, the majority of Nebraska is designated a "brand inspection area."[6]



Brand Inspection Area is outlined in BLACK
Non-Brand Inspection Area is outlined in RED

Generally, cattle moving in or out of the brand inspection area, as well as cattle being sold, traded, or slaughtered within the brand inspection area, are subject to inspection by the Brand Committee.[7] A brand inspection consists of a physical inspection of the cattle and must be done sometime during the hours from sunrise to sundown or during such other hours and under such conditions as the Brand Committee determines.[8] However, if the operator of a cattle-feeding operation

---

[4] See Neb. Rev. Stat. § 54-199 (Reissue 2021).

[5] See Neb. Rev. Stat. §§ 54-198 and 54-1,107 (Reissue 2021).

[6] See Neb. Rev. Stat. § 54-1,109 (Reissue 2021).

[7] See Neb. Rev. Stat. §§ 54-1,110, 54-1,111, 54-1,114, 54-1,121, and 54-1,122 (Reissue 2021).

[8] See Neb. Rev. Stat. § 54-1,108 (Reissue 2021).

registers a feedlot through the Brand Committee, that operator can, under some circumstances, send and receive cattle without such inspections.[9] In turn, registered feedlots must keep cattle inventory records, which are subject to audits by the Brand Committee.[10] Per § 54-1,120(2), the Brand Committee "may adopt and promulgate rules and regulations for the operation of registered feedlots to assure that brand laws are complied with, that registered feedlot shipping certificates are available, and that proper records are maintained." One of the primary benefits of the registered feedlot program is that it allows certain cattle to be received at or sent from the registered feedlot at any hour of the day without the need to have a brand inspector physically inspect the cattle.

Presently, Adams Land & Cattle, LLC (ALCC), operates two registered feedlots in Broken Bow, Nebraska, with a capacity for over 93,000 head of cattle, as well as a third registered feedlot near Bertrand, Nebraska. ALCC and the Brand Committee dispute whether § 54-1,122 requires brand inspections of cattle that, after purchase, are moved to a "backgrounding" lot and then, ultimately, to a registered feedlot. Backgrounding is a stage intended to increase a calf's weight and build up the calf's immunity to diseases before it enters a feedlot. ALCC began using backgrounding lots in 2008.

To address the parties' arguments, we must first explain the historical and factual context in which this dispute arose. In August 2008, ALCC entered into a written agreement with the Brand Committee that purported to govern the obtaining and renewing of ALCC's registered feedlot permits, as well as ALCC's exemptions from brand inspection requirements. ALCC subsequently received registered feedlot permits. ALCC urged the Brand Committee to interpret § 54-1,122 in a way that exempted ALCC's cattle from brand inspections and associated fees. On September 17, 2009, the Brand

---

[9] See §§ 54-1,110, 54-1,111, 54-1,121, and 54-1,122.

[10] See Neb. Rev. Stat. § 54-1,120 (Reissue 2021).

Committee held a formal public meeting, designating "Registered Feedlots - Acceptance of documentary evidence of ownership upon entry" as an agenda item. Meeting minutes provide that the Brand Committee voted to,

> [u]pon approval by the [Brand] Committee's legal counsel, allow a registered feedlot to bring cattle into their registered feedlot without inspection if they come from their back grounding [sic] feedlots, the integrity of the cattle remain in tact [sic] with documentary evidence of ownership, there is no change of ownership, and the cattle must be owned by the registered feedlot.

In October 2009, the Brand Committee and ALCC executed an "addendum" to their 2008 registered feedlot agreement, which provided, in pertinent part:

> Cattle may be placed in the Registered Feedlot without a brand inspection being performed, provided they are (1) moved directly from purchase point of origin to the Registered Feedlot and the satisfactory evidence of ownership accompanies the cattle; or (2) moved directly from a backgrounding feedlot, whether registered or unregistered inside the boundaries of the Nebraska Brand Inspection Area or from a feedlot outside the brand inspection area as long as [ALCC] own said cattle and there is no change of ownership; (3) the integrity of the cattle from original purchase must remain the same; and (4) the satisfactory documentary evidence of ownership must accompany the cattle from the backgrounding lot to the registered feedlot.

From 2009 onward, the Brand Committee did not conduct brand inspections of cattle sent from or received at ALCC's registered feedlots. Instead, the Brand Committee monitored incoming cattle at ALCC's registered feedlots via regular audits of ALCC's records. ALCC successfully renewed its registered feedlot permits annually from 2009 to 2018. Throughout this time, ALCC regularly purchased cattle from throughout the United States and Canada. After purchase, ALCC's

cattle were shipped either directly to its registered feedlots or to backgrounding lots managed by a third party. After backgrounding, ALCC's cattle were transferred to its registered feedlots without brand inspection. As the Brand Committee emphasizes, ALCC was an outlier in this regard—from 2009 onward, only ALCC has operated under an addendum removing the requirement of inspection for cattle transferred from backgrounding lots to registered feedlots. All other registered feedlots in Nebraska have been subject to brand inspections for incoming cattle that are not moved directly from their points of origin. There are approximately 100 registered feedlots in Nebraska.

On June 14, 2018, the Brand Committee sent a letter to ALCC explaining that the parties' 2009 addendum was not authorized by state law and would not be honored. The letter gave ALCC until August 31, 2018, to meet applicable requirements. On July 13, 2018, ALCC brought action against the Brand Committee, seeking a declaratory judgment that the Brand Committee's letter was unlawful. Subsequently, the Brand Committee rescinded the letter, and ALCC voluntarily dismissed its lawsuit. In September 2018, ALCC successfully renewed its registered feedlot permits. The Brand Committee did not renew ALCC's permits in 2019 and, at some point, unsuccessfully attempted to have the Legislature amend § 54-1,122. Still, the Brand Committee refrained from inspecting ALCC's cattle.

In June 2020, the Brand Committee sent another letter to ALCC, again explaining that the 2009 addendum was not authorized by state law and would not be honored. The new letter gave ALCC until August 31, 2020, to meet applicable requirements. On August 4, 2020, ALCC, by and through counsel, demanded that the Brand Committee rescind their June 2020 letter and continue to deal with ALCC as the 2009 addendum provided. The Brand Committee did not respond.

On August 31, 2020, ALCC brought this action against Brand Committee representatives, namely, John Widdowson,

Adam Sawyer, Terry Cone, Jay Martindale, and Christopher Gentry. At all relevant times, Widdowson, Sawyer, Cone, Martindale, and Gentry have been the Brand Committee's executive director, chairperson, vice chairperson, and members, respectively. Per its complaint and amended complaint, ALCC sought a declaratory judgment and injunctive relief. The Brand Committee moved to dismiss ALCC's amended complaint on the basis that ALCC had failed to state a claim upon which relief could be granted. The court denied the Brand Committee's motion.

On January 4, 2021, ALCC moved for a temporary injunction, essentially seeking to prevent the Brand Committee and its agents from physically inspecting ALCC's cattle, charging brand inspection fees, or taking any action affecting ALCC's permits or registrations. The district court granted the requested temporary injunction in favor of ALCC. On December 1, the Brand Committee voted to formally rescind any prior interpretation of § 54-1,122 that purported to allow the movement of cattle from backgrounding lots to registered feedlots under certain conditions without inspection.

In April 2022, a bench trial was held. On June 18, 2022, the district court granted declaratory relief and a permanent injunction in favor of ALCC, concluding that the parties' "course of dealing for over a decade" together with the Brand Committee's "historical interpretation" of § 54-1,122 were entitled to "great weight." The court also observed that while it was not controlling authority, a 2016 Nebraska Attorney General's opinion appeared to support ALCC's position.[11] The court awarded ALCC court costs. The Brand Committee appeals.

ASSIGNMENTS OF ERROR

The Brand Committee argues that the district court erred in granting declaratory and injunctive relief in favor of ALCC. Specifically, the Brand Committee assigns that the

---

[11] See Att'y Gen. Op. No. 16-002 (Jan. 22, 2016).

district court erred in (1) concluding that § 54-1,122 does not require direct movement from the point of origin with required paperwork to avoid a brand inspection upon entry to the registered feedlot; (2) failing to construe § 54-1,122 consistent with the statutory purpose of the Act; (3) failing to "take into account" the fact that the Brand Committee has administered the registered feedlot program consistently for every other registered feedlot since at least 2009, except ALCC; (4) failing to recognize that the 2009 vote of the Brand Committee was abrogated by a Brand Committee vote in December 2021; (5) finding that the 2016 Attorney General's opinion supported ALCC's argument; and (6) awarding costs.

## STANDARD OF REVIEW

[1] Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court.[12]

## ANALYSIS

[2,3] This case raises an issue of first impression concerning the meaning of § 54-1,122. When statutory interpretation is one of first impression, the statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[13] If the language of a statute is clear, the words of such statute are the end of any judicial inquiry regarding its meaning.[14]

We first note that § 54-1,122 was amended by the Legislature during the pendency of this matter. However, the amendment has no bearing on the issue currently before us. Section 54-1,122 is titled "Registered feedlot; cattle received; requirements." As one might expect, the provision sets forth requirements for cattle received at registered feedlots. First,

---

[12] *State v. Castillo-Rodriguez*, 313 Neb. 763, 986 N.W.2d 78 (2023).

[13] *Diamond v. State*, 302 Neb. 892, 926 N.W.2d 71 (2019).

[14] *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023).

§ 54-1,122 provides that "[a]ny cattle originating in a state that has a brand inspection agency and which are accompanied by a certificate of inspection or brand clearance issued by such agency may be moved directly from the point of origin into a registered feedlot." The Act does not define "directly," but its intended definition appears from the context, as well as the word's plain and ordinary meaning, to be "with no other movement in between."[15] Nor does the Act define "point of origin," but witnesses testified that the term generally means where the cattle originated or were brand inspected, or where change of ownership takes place. Next, § 54-1,122 states: "Any cattle not accompanied by such a certificate of inspection or brand clearance or by satisfactory evidence of ownership from states or portions of states not having brand inspection shall be subjected to [brand inspection] within a reasonable time after arrival at a registered feedlot . . . ."

The second sentence refers back to the first sentence through the word "such." The determiner "such" appears at the beginning of a noun phrase and qualifies "a certificate of inspection or brand clearance." Accordingly, the second sentence cannot be read to require *any* "certificate of inspection" or *any* "brand clearance." Instead, the paperwork required to avoid brand inspection is that which is available to prove that a cattle's ownership was verified at the place it was sent from. For cattle sent from a brand inspection area, the required paperwork consists of "a certificate of inspection or brand clearance."[16]

---

[15] See, e.g., Merriam-Webster's Collegiate Dictionary 353, 354 (11th ed. 2020) (defining "direct" as "proceeding from one point to another in time or space without deviation or interruption" and "directly" as "in a direct manner").

[16] See Neb. Rev. Stat. §§ 54-179 (defining "certificate of inspection" as official document authorizing, inter alia, movement of livestock and designating, as needed, seller, shipper, purchaser, and destination of livestock, as well as relevant vehicle number) and 54-173 (Reissue 2021) (defining "brand clearance" as documentary evidence of ownership given to persons who have legally purchased cattle at livestock auction or sale where brand inspection service is provided).

For cattle sent from a state or portion of a state without brand inspection, the required paperwork consists of "satisfactory evidence of proof of ownership."[17]

Read together, the two sentences provide that if cattle move into registered feedlots from their points of origin with no other movement in between and are accompanied by paperwork that proves they have been so moved, they avoid brand inspection. Otherwise, the statute requires brand inspection. Thus, we agree with the Brand Committee's interpretation: Cattle that move from their point of origin to backgrounding lots and then later to registered feedlots do not avoid brand inspection.

ALCC emphasizes the Brand Committee's 2009 vote, as well as the parties' course of dealing. ALCC argues that the Brand Committee has historically interpreted the statute in ALCC's favor and is precluded, by legislative acquiescence, from changing course. We have occasionally stated the following rule: Where a statute has long been construed by administrative officials charged with its execution, and where the Legislature has several times been in session without amending or changing such a statute, despite its full knowledge of the interpretation, we will not disregard that interpretation unless it is clearly erroneous.[18]

We are unconvinced, however, that any historical interpretation by the Brand Committee exists or warrants our deference. The Brand Committee's 2009 vote, taken together with its actions and omissions thereafter, do evidence an agreement that § 54-1,122 would not be enforced against ALCC. However, ALCC's addendum was an anomaly. The most that can be said is that for whatever reason or reasons, the Brand Committee enforced § 54-1,122 in one way as to ALCC and in another way as to all others for over a decade. We

---

[17] See 54 Neb. Admin. Code, ch. 10, § 3 (2014).

[18] See *Davio v. Nebraska Dept. of Health & Human Servs.*, 280 Neb. 263, 786 N.W.2d 655 (2010).

are similarly unconvinced to stray from the unambiguous language of the statute by ALCC's argument of legislative acquiescence. Although the parties agree that the Brand Committee tried and failed to have the Legislature amend § 54-1,122, there is no evidence in this case that the Legislature viewed the Brand Committee's 2009 vote and its implementation as an interpretation of § 54-1,122, let alone that the Legislature had full knowledge of, considered, or agreed with such interpretation.[19]

[4-6] More important, our seldom-used rule of legislative acquiescence to administrative interpretations is but a complement to the traditional rules of statutory construction already set forth.[20] It does not change the fact that an administrative agency may not employ its rulemaking power to modify, alter, or enlarge provisions of a statute which it is charged with administering.[21] An administrative body has no power or authority other than that specifically conferred by statute or by construction necessary to accomplish the plain purpose of the act.[22]

ALCC also argues that a January 22, 2016, Attorney General's opinion supports its position.[23] The Attorney General's opinion addresses whether the Brand Committee has statutory authority "to vary the inspection fee and the registered feedlot enrollment fee."[24] In that context, it addresses the difference between a brand inspection and a registered feedlot audit. The Attorney General's opinion does not address the question of when cattle are subject to brand inspection upon entry to a registered feedlot or reference § 54-1,122. Accordingly, it is not relevant here.

---

[19] Cf. *id.*

[20] *Id.*

[21] *Id.*

[22] *Murray v. Neth*, 279 Neb. 947, 783 N.W.2d 424 (2010).

[23] Att'y Gen. Op. No. 16-002, *supra* note 11.

[24] *Id.* at 1.

The district court erred in its interpretation of § 54-1,122 and in granting a declaratory judgment and permanent injunction in favor of ALCC.

## CONCLUSION

The district court erred in granting a declaratory judgment and permanent injunction in favor of ALCC. Accordingly, we reverse its judgment, vacate its injunction, and dismiss the amended complaint.

Reversed, injunction vacated, and dismissed.

Miller-Lerman, J., not participating.